UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SCOTT ALAN RICHARDSON, and PAMELA
RICHARDSON,

               Plaintiffs,                        Case No. 3:14-cv-00588-ST

        v.                                 FINDINGS AND
                                        RECOMMENDATIONS

CITY OF GLADSTONE; PETER BOYCE;
JAMES PRYDE; CLAY GLASGOW; SEAN
BOYLE; and JOHN DOES 1-99,

               Defendants.

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiffs, Scott and Pamela Richardson, owned and operated a business in Gladstone,

Oregon, until 2012.  Appearing *pro se*, they filed this action against the City of Gladstone

("City") and several of its employees for targeting their business with citations for violations of

City ordinances without due process of law and retaliating against them for engaging in

constitutionally protected speech.  This court initially appointed *pro bono* counsel for plaintiffs

for the limited purpose of filing an amended complaint (docket #6).  After filing a First Amended

Complaint, their counsel requested termination, which was granted (docket #17).  Plaintiffs then

filed a Second Amended Complaint (docket #34).

The Second Amended Complaint names the following City of Gladstone employees as defendants:  Clay Glasgow (Senior Planner), Peter Boyce (City Administrator), James Pryde (Chief of Police), and Sean Boyle (Ordinance Specialist), as well as unidentified John Does 1-99.[1]  Second Amended Complaint, ¶¶ 4–9.  Plaintiffs allege claims under 42 USC § 1983 based on defendants depriving them of their property interests without due process of law under the Fourth Amendment (Claim 1), depriving them of equal protection under the Fourteenth Amendment (Claim 2), and retaliating against them for exercising their free speech rights under the First Amendment (Claim 3).  They also allege common law claims for malicious prosecution (Claim 4), tortious interference with business relations (Claim 5), and intentional infliction of emotional distress ("IIED") (Claim 6).  This court has federal question jurisdiction over the § 1983 claims under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367(a).

Defendants have filed a Motion to Dismiss the Second Amended Complaint (docket #41) for failure to state a claim upon which relief can be granted.  For the reasons stated, defendants' motion should be granted in part and denied in part.

## LEGAL STANDARD

In order to survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007).  In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light

---

[1] The original (docket #2) and First Amended Complaint (docket #11) also named Wade Byers (City of Gladstone Mayor) as an individual defendant.  However, he is no longer named as a defendant.

most favorable to the non-moving party.  *Parks Sch. of Bus., Inc. v. Symington*, 51 F3d 1480, 1484 (9th Cir 1995).

## <u>ALLEGATIONS</u>

Plaintiffs owned and operated the Arlington Mart, a convenience store over which they rented rooms, from 1996 until its closure in 2012.  Second Amended Complaint, ¶¶ 3, 10.  In 2009, they contracted with Tim Causey, plaintiffs' African-American cousin, to cook and operate a wood "smoker" barbeque in the parking lot.  *Id*, ¶ 11.

In June 2010, the City's Senior Planner, Clay Glasgow ("Glasgow") first informed plaintiffs of a neighbor's complaint about the wood smoker and a possible planning violation. *Id*, ¶ 11.  The next month, an unidentified Fire Marshall observed the barbeque but made no comment about it violating the City's code, and an unidentified police offer at the Arlington Mart on an unrelated call mentioned that the police had received several complaints from neighbors. *Id*, ¶ 13.

In February 2011, the City's Municipal Ordinance Specialist, Sean Boyle ("Boyle"), notified plaintiffs that the barbeque might be violating the City's code that could result in a $500.00 per day fine.  *Id*, ¶ 14.  In response, plaintiffs attempted to avoid a citation by reconstructing the wood smoker to reduce its smoke footprint and requesting to mediate the dispute with the City.  *Id*.  The City initially agreed to mediation, but then refused, and in May 2011 cited plaintiffs for conducting business activities outside the Arlington Mart.  *Id*, ¶¶ 15–16. The liquor license for the Arlington Mart allowed outside business activities.  *Id*, ¶ 16.  Taverns near the Arlington Mart that operated open-air barbeques never received citations, either because their operations complied with the City's code or the City did not target their non-compliance. *Id*, ¶ 15.

Plaintiffs gathered signatures from community members, including neighbors of the Arlington Mart, for a petition supporting their barbeque operation. *Id*, ¶ 17. They also had a collection jar in the Arlington Mart to update customers about the status of their citation and to communicate their disapproval with the City's treatment of their business. *Id*. "On a number of occasions, City officials or their agents had seen or heard" plaintiffs' public condemnation of the City and "expressed their displeasure with the [plaintiffs'] speech activities through third parties and in court proceedings in an attempt to dissuade [plaintiffs] from engaging in such activities." *Id.*

In August 2011, the City dismissed the citation due to improper service. *Id*, ¶ 18. At the trial on the matter, the Gladstone City Attorney referenced, but could not produce evidence of, numerous complaints from neighbors. *Id.*

In October 2011, the City issued plaintiffs a second citation for failing to adequately buffer smoke from their barbeque. *Id*, ¶ 21. Plaintiffs learned from a City planning official that the code section under which they were cited applied only to businesses under review by the City Planning Commission and that the section required such review only when a business was seeking a substantial change in the nature of its operation or business hours. *Id.* Plaintiffs' several attempts to mediate the citation were ignored by the City. *Id*, ¶ 22.

On November 4, 2011, Boyle made an obscene gesture in the direction of the Arlington Mart while driving by in a City vehicle. *Id.* Plaintiffs reported Boyle's behavior to the police with a witness statement and Chief of Police James Pryde ("Chief Pryde") conducted a cursory investigation that absolved Boyle. *Id.* For six days following his decision, Chief Pryde "sent a series of emails to Mr. Richardson threatening Mr. Richardson for false reporting and disparaging Mr. Richardson's character." *Id.*

After the City issued the first citation, plaintiffs observed increased police surveillance of their business (*id*, ¶ 19), and their numerous requests for police protection from increasing racial harassment from the community were ignored. *Id*, ¶¶ 20, 24. On November 14, 2012, plaintiffs learned through a public records request that Chief Pryde had ordered his officers to only respond to plaintiffs' calls in groups of two or more officers. *Id*, ¶ 24. "This policy continued to disrupt [plaintiffs'] business activities, embolden their racist assailants, and endanger their lives." *Id*, ¶ 25.

On November 25, 2011, plaintiffs called the police dispatcher because a group of men who had previously vandalized their barbeque gathered in front of the Arlington Mart yelling imminent threats and racist remarks at plaintiffs. *Id*, ¶ 24(a). The dispatcher told plaintiffs that such threats were constitutionally protected and that no officer was available to respond. *Id*. The next morning, an officer on duty the previous night explained to plaintiffs that he was the only officer on duty that night and was responding to another important matter. *Id*, ¶ 24(b). When plaintiffs attended a City Council meeting to advocate for increased police resources, that same officer changed his story and testified that two officers were on duty the night of November 25. *Id*, ¶ 24(c).

On November 29, 2011, plaintiffs defended themselves at a trial regarding the second citation. *Id*, ¶ 23. The court ordered plaintiffs to pay a $500.00 fine and to seek approval from the City Planning Commission for their barbeque operation. *Id*.

In December 2011, plaintiffs contacted County Resolution Services to clarify with City officials the regulations that applied to their barbeque operation and what permits they needed, but the City refused to cooperate. *Id*, ¶ 26. Plaintiffs were told by the Fire Marshall that the only City ordinances regulating barbeques applied to apartment building balconies and not businesses.

*Id*, ¶ 27.  Likewise, the Oregon Department of Environmental Quality told plaintiffs that no state restrictions affected barbeque operation, but advised lengthening the smokestack, which plaintiffs had already done.  *Id*.

In January 2012, despite plaintiffs' installment of a device that reduced the smoke emissions from their property, the City issued a third citation.  *Id*, ¶ 28.  Again, several other businesses located within the same zoning area, including two across the street from City Hall, operated barbeques without citation.  *Id*.

On April 3, 2012, plaintiffs appeared in court for the third citation.  At that hearing, Glasgow revealed that his sole source of complaint was a non-resident owner of an empty duplex adjacent to the Arlington Mart who had previously launched racist tirades against plaintiffs and their cousin.  *Id*.  The City Attorney proposed to have five test burns to see if the barbeque modification sufficiently mitigated the smoke and have plaintiffs appear before the City Planning Commission for approval.  *Id*, ¶ 30.  Based on emails plaintiffs later obtained from Clackamas County on June 8, 2012, pursuant to a public records request, Glasgow wanted plaintiffs brought before the City Planning Commission in order to arbitrarily revoke their business license.  *Id*.

Plaintiffs agreed to coordinate a meeting with the City officials so that they could observe the size of the smoke plume and asked the City Attorney to plan a meeting with Glasgow.  *Id*, ¶ 31.  The City Attorney attended one of the five tests and remarked that the smoke plume was negligible, but he never arranged a meeting with Glasgow and no City official attended the subsequent tests.  *Id.*

In court on May 22, 2012, the City Attorney noted that the barbeque emitted very little smoke, but that plaintiffs had been uncooperative with the test dates and had not met with

Glasgow. *Id*, ¶ 32. The judge dismissed the third ticket with no conditions, including no City Planning Commission review. *Id.*

Ultimately, the financial toll of continuously and unfairly litigating with defendants was too grave, and the Arlington Mart was dissolved in July 2012. *Id*, ¶ 33. Plaintiffs' business properties were then foreclosed upon and sold in January 2013, resulting in further economic injury due to the loss of rental income. *Id.* Because of the loss of their business and properties, plaintiffs could no longer pay debts owed by their businesses and declared personal bankruptcy in June 2013.[2] *Id.*

## FINDINGS

Defendants seek to dismiss all of plaintiffs' claims as barred by the statute of limitations and for failing to state a claim upon which relief can be granted.

## I.    Statute of Limitation

Plaintiffs' common law claims (Claims 4–6) are subject to Oregon's two-year statute of limitations under ORS 30.275 for personal-injury torts arising out of any act or omission of a public body or an officer, agent, or employee of the public body. Federal civil rights claims brought under 42 USC § 1983 are subject to the forum state's statute of limitations for personal

---

[2]  Although plaintiffs are still involved in a Chapter 13 Bankruptcy proceeding (*In re Richardson et al*, Case No. 13-34144-rld13), their claims are not subject to the automatic stay imposed by 11 USC § 362. When a debtor files for bankruptcy protection, 11 USC § 362 imposes an automatic stay of other lawsuits, including the commencement or continuation of an action against the debtor, the enforcement of a judgment against the debtor or property of his or her estate, any act to collect a debt of the debtor and/or any act to obtain property of the debtor. However, the § 362 stay does not apply to offensive actions by the debtor or suit is not, by opposing that suit, seeking to take possession of it,'" none of the circumstances outlined in 11 USC § 362 apply to an offensive action by the debtor. *In re White*, 186 BR 700, 704 (BAP 9th Cir 1995) (citation omitted). The stay is intended to "protect the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors." *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F2d 575, 577 (7th Cir 1989). "'True, the bankrupt's cause of action is an asset of the estate; but as the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it,'" none of the circumstances outlined in 11 USC § 362 apply to an offensive action by the debtor. *In re White*, 186 BR at 704, quoting *Martin-Trigona*, 892 F2d at 577.

injury torts. *Owens v. Okure*, 488 US 235, 249–50 (1989).  Therefore, plaintiffs' § 1983 claims

(Claims 1-3) are subject to the same two-year statute of limitations in ORS 30.275.

A § 1983 claim accrues, and the statute of limitations begins to run, when the plaintiff

knows, or should know, of the injury that is the basis for his or her claims.  *RK Ventures, Inc. v.*

*City of Seattle*, 307 F3d 1045, 1058 (9th Cir 2002).  Thus, the limitations period begins to run

once a plaintiff has knowledge of the "critical facts" of the injury, including "that he has been

hurt and who has inflicted the injury."  *Bibeau v. Pacific Nw. Research Found.*, 188 F3d 1105,

1108 (9th Cir 1999), quoting *United States v. Kubrick*, 444 US 111, 122 (1979).

Plaintiffs filed this action on April 9, 2014.  Therefore, any claims based on defendants'

conduct prior to April 9, 2012, are barred by the statute of limitations.  Defendants argue that

only two of plaintiffs' allegations pertain to actions occurring after April 9, 2012, namely their

appearance in court on May 22, 2012, for the third ticket that was dismissed (Second Amended

Complaint, ¶ 32), and the July 2012 dissolution of their business and subsequent foreclosure of

their properties (*id*, ¶ 33), neither of which relate to any constitutional violation or tort claim.

Plaintiffs respond that the City's continuing violations tolled the statute of limitations.

"The continuing violations doctrine extends the accrual of a claim if a continuing system of

discrimination violates an individual's rights 'up to a point in time that falls within the applicable

limitations period.'"  *Douglas v. Cal. Dep't of Youth Auth.*, 271 F3d 812, 822 (9th Cir 2001),

quoting *Williams v. Owens-Illinois, Inc.*, 665 F2d 918, 924 (9th Cir 1982).  "The doctrine is

applicable either where the defendants have engaged in a 'series of related acts' against him or

engaged in a 'systematic policy or practice . . . that operated, in part, within the limitations period

— a systemic violation."  *Gutierrez v. Williams*, No. 3:09-CV-6204-KI, 2011 WL 2559788, at *5

(D Or June 29, 2011), quoting *Douglas*, 271 F3d at 822; *see also Nesovic v. United States*, 71

F3d 776, 778 (9th Cir 1995) (internal quotation marks omitted) ("The continuing violation theory can only be supported by "repeated instances or continuing acts of the same nature, as for instance, repeated acts of sexual harassment or repeated discriminatory employment practices."). "[T]he relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period.  The reason is that the continuing system of discrimination operates against the [plaintiff] and violates his or her rights up to a point in time that falls within the applicable limitations period."  *Williams v. Owens-Illinois, Inc.*, 665 F2d 918, 924 (9th Cir 1982), *opinion modified on denial of reh'g*, No. 79-4110, 1982 WL 308873 (9th Cir June 11, 1982).

    The Second Amended Complaint contains sufficient allegations to support a continuing violations theory.  All of plaintiffs' claims derive from defendants' "continuous discriminatory enforcement of city codes against their business, . . . and their retaliatory acts against the [plaintiffs] for making complaints and engaging in protected First Amendment activities."  *Id*, p. 1.  Both the alleged discriminatory enforcement and retaliation continued past April 9, 2012.

    On November 14, 2012, plaintiffs learned from a public records request that in retaliation for their criticism of the City police department, "Chief of Police Jim Pryde had arbitrarily ordered his officers to respond to the [plaintiffs'] calls in groups of two or more officers."  *Id*, ¶ 24.  Enforcement of this policy deprived plaintiffs of adequate police coverage during dangerous situations at the Arlington Mart and "continued to disrupt [their] business activities, embolden their racist assailants, and endanger[] their lives through to the dissolution."  *Id*, ¶ 25. Although it is not clear from the allegations, enforcement of this policy presumably continued throughout the time plaintiffs operated their business until its dissolution in July 2012.

Likewise, the discriminatory enforcement of the City's codes continued through the dismissal of the third citation on May 22, 2012.  At an initial hearing on April 3, 2012, plaintiffs agreed to allow City officials to run several tests of their wood smoker to determine whether their voluntary modifications had corrected the violation and to appear before the City Planning Commission.  *Id*, ¶¶ 30–31.  Other than the City Attorney who attended the first test date, no City employee attended the tests.  *Id*, ¶ 31.  Additionally, Glasgow never met with plaintiffs as requested.  *Id.*  On May 22, 2012, the court dismissed the third citation without a City Planning Commission review.  *Id*, ¶ 32.  On June 8, 2012, plaintiffs learned from another public records request that Glasgow had suggested the testing in order to force plaintiffs to appear before the City Planning Commission and have their business license revoked.  *Id*, ¶ 30.

Defendants argue that the May 22, 2012 court hearing and July 2012 dissolution of their business are not continuing violations, but are simply the results of the alleged discriminatory enforcement of the City's codes against plaintiffs' business.  "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation."  *Ward v. Caulk*, 650 F2d 1144, 1147 (9th Cir 1981) (citation omitted).  Due to the fact that "current effects alone cannot breathe life into prior, unchanged discrimination; . . . such effects in themselves have 'no present legal consequences.'"  *Garcia v. Brockway*, 526 F3d 456, 463 (9th Cir 2008), quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 US 618, 626 (2007), *overturned by* US Pub L No 111-1 (Jan. 29, 2009).  Defendants characterize the loss of the Arlington Mart in July 2012 as merely a delayed result of their earlier alleged efforts to discriminate against plaintiffs' business.  Second Amended Complaint, ¶ 33 ("Ultimately, the financial toll of continuously and unfairly litigating these issues with the Defendants was too grave, and [the] Arlington Mart was dissolved in July 2012.") .

However, the May 22, 2012 hearing constitutes an independent violation of malicious prosecution and unconstitutional discrimination.  As explained above, the hearing was a continuation of the discriminatory enforcement of plaintiffs' third and final citation by Glasgow. The hearing was also the culmination of alleged malicious prosecution undertaken with the assistance of the City Attorney who represented the City at the hearings.  At the May 22, 2012 hearing, the City Attorney allegedly misrepresented plaintiffs as uncooperative in scheduling the test dates and a meeting with Glasgow.  *Id.*  Thus, the Complaint alleges attempts by City officials to discriminate against and prosecute plaintiffs' business which began before and continuing through the May 22, 2012 hearing.

Plaintiffs also argue that defendants' refusal to mediate and attempt to revoke their business license through misuse of the planning process occurred after April 9, 2012, although the Second Amended Complaint does not allege specific dates for these events.  Likewise, plaintiffs argue that Chief Pryde's two-officer policy remained in effect past April 9, 2012, as evidenced by their allegation that the police failed to respond to calls to the Arlington Mart when the station was short-staffed.  For these reasons, plaintiffs' claims should not be dismissed under the continuing violation theory.

II.    **§ 1983 Claims (Claims 1–3)**

A.    **Participation of Chief Pryde, Boyle and Boyce**

Chief Pryde, Boyle and Peter Boyce ("Boyce"), the City Administrator, argue that plaintiffs do not adequately allege sufficient personal participation by them in any constitutional violation.  "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights.  Liability under § 1983 must be based on the personal involvement of the defendant."  *Barren v. Harrington*, 152 F3d 1193, 1194

(9th Cir 1998) (citation omitted), *cert. denied*, 525 US 1154 (1999).  Accordingly, "state officials are not subject to suit under § 1983 unless they play an affirmative part in the alleged deprivation of constitutional rights."  *King v. Atiyeh,* 814 F2d 565, 568 (9th Cir 1987) (citation omitted), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F3d 896 (9th Cir 2012).

As a general rule, there is no vicarious liability under § 1983.  *Barren*, 152 F3d at 1194. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to prevent them." *Taylor v. List,* 880 F2d 1040, 1045 (9th Cir 1989) (citations omitted).  "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652 F3d 1202, 1207 (9th Cir 2011).  "A supervisor can be liable in his individual capacity for his own culpable action or an action in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."  *Id* at 1208 (citation and internal quotation marks omitted).

As to Boyce, plaintiffs do not allege facts suggesting that he personally violated their civil rights, other than that he supervised Chief Pryde and Boyle during the relevant time period. Second Amended Complaint, ¶¶ 39, 50, & 59 ("Defendants Peter Boyce and Clay Glasgow collaborated with and directed defendants James Pryde and Sean Boyle in their actions.").  There are no specific allegations that he trained, supervised, or controlled Chief Pryde and Boyle in their violations of plaintiffs' civil rights, or that he even knew such violations were occurring. Accordingly, the claims against Boyce should be dismissed.

In contrast, plaintiffs specifically allege individual involvement by Boyle and Chief Pryde in the alleged constitutional violations. As to Boyle, plaintiffs allege that he: (1) notified plaintiffs of a potential code violation related to their barbeque in February 2011, for which they were cited three months later (*id*, ¶¶ 14, 16); and (2) made an obscene gesture in the direction of the Arlington Mart while driving a City vehicle on November 4, 2011. *Id*, ¶ 22. Such facts are sufficient to allege that Boyle was personally involved in the allegedly discriminatory enforcement of the City's codes against plaintiffs.

As to Chief Pryde, plaintiffs allege that he: (1) failed to conduct a thorough investigation of plaintiffs' report of Boyle's obscene conduct; (2) sent Mr. Richardson a series of emails threatening Mr. Richardson with charges of false reporting and disparaging Mr. Richardson's character (*id*); and (3) instituted a City policy that "arbitrarily ordered his officers to only respond to [plaintiffs'] calls in groups of two or more officers," resulting in at least one incident where police refused to respond to plaintiffs' request for police protection. *Id*, ¶ 24. Chief Pryde's institution of the policy alone is sufficient to allege his personal involvement in all alleged constitutional violations.

### B. *Monell* Liability of City

The City argues that plaintiffs have failed to plead sufficient facts to support a § 1983 claim against it. "Local governmental units or municipalities, including counties, can be sued as a 'person' under § 1983 when an official policy results in a constitutional violation." *Hervey v. Estes*, 65 F3d 784, 791 (9th Cir 1995), citing *Monell v. Dep't of Soc. Servs.*, 436 US 658, 690 (1978). Municipalities and other local governing bodies may be liable under any one of three theories: (1) if an employee was acting pursuant to an expressly adopted official policy; (2) if an employee was acting pursuant to a longstanding practice or custom; or (3) if an employee was

acting as a final policymaker.  *Lytle v. Carl*, 382 F3d 978, 982 (9th Cir 2004).  An employee may

act as a *de facto* policymaker without explicit authority and may be delegated as a final

policymaker by an official who possesses such authority.  *Id.*  A policy may be a rule or practice

applicable in many situations, as well as a "course of action tailored to a particular situation and

not intended to control decisions in later situations."  *Id* at 983 (emphasis deleted).  The existence

of a policy or custom cannot be based solely on the occurrence of a single incident or

unconstitutional action by a non-policymaking employee.  *Davis v. City of Ellensburg*, 869 F2d

1230, 1233 (9th Cir 1989).

    In each of the first three claims, plaintiffs allege the conclusion that the City "maintained

a policy or custom" that violated their constitutional rights.  Second Amended Complaint, ¶¶ 38

("improperly depriving [plaintiffs] of their property interests without due process of law), 49

("denying [plaintiff] equal protection under the law"), & 58 ("against [plaintiffs] for exercising

their protected speech rights").   However, none of these claims contain the specificity necessary

to state a *Monell* claim against the City.  They do not allege that any City employee acted

pursuant to an expressly adopted official policy, to a longstanding practice or custom, or as a

final policymaker.

    The closest plaintiffs come to alleging any claim against the City that satisfies *Monell* is

the allegation that Chief Pryde, as head of the City's Police Department, arbitrarily ordered his

officers to respond only to plaintiffs' calls with no fewer than two officers.  Second Amended

Complaint, ¶ 24.  Any claim against Chief Pryde in his official capacity is identical to a claim

against the City.  *Kentucky v. Graham*, 473 US 159, 165 (1985) (an official-capacity suit simply

"represent[s] only another way of pleading an action against an entity of which an officer is an

agent.");  *see also Hafer v. Melo*, 502 US 21, 25 112 (1991) ("Suits against state officials in

their official capacity therefore should be treated as suits against the State.").  Assuming that

Chief Pryde, in his official capacity, acted pursuant to a longstanding practice or custom of the

City or was the final policymaker with respect to this policy, then plaintiffs may be able to state a

*Monell* claim against the City based on this policy.  However, the current allegations are

insufficient to proceed with this claim.  Therefore, Claims 1-3 against the City should be

dismissed.

      **C.  <u>Violations of Constitutional Rights</u>**

           **1.  <u>Due Process Claim (Claim 1)</u>**

The Fourteenth Amendment prohibits states and local governments from depriving

citizens of life, liberty, or property, without due process of law.  A § 1983 claim based upon the

deprivation of procedural due process has three elements:  "(1) a liberty or property interest

protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack

of process."  *Portman v. County. of Santa Clara*, 995 F2d 898, 904 (9th Cir 1993).  The threshold

requirement of a procedural due process claim is the existence of a constitutionally protected

interest.  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F3d 56, 62 (9th Cir 1994).

Plaintiffs allege that defendants deprived them of a property interest in their business and

rental property.  "A protected property interest is present where an individual has a reasonable

expectation of entitlement deriving from 'existing rules or understandings that stem from an

independent source such as state law.'"  *Id*, quoting *Board of Regents v. Roth*, 408 US 564, 569

(1972).  In cases where plaintiffs claim a property interest in a governmental benefit, such as the

right to renew a certificate, the "mere fact a person has received a governmental benefit in the

past, even for a considerable length of time, does not, without more, rise to the level of a

legitimate claim of entitlement." *Thornton v. City of St. Helens*, 425 F3d 1158, 1164 (9th Cir

2005) (citation and internal quotation marks omitted).

Plaintiffs do not allege that the City revoked an interest created by state or local law, such

as their barbeque privileges or business license.  The only penalty from the government actions

relating to their property was a $500.00 fine for the second citation.  *Id*, ¶ 23.  However, their

claim is not based on being deprived of their property interest in $500.00.  Instead, they allege

that the cost of defending the City's multiple citations caused them financial hardship, which

forced them to dissolve their business and resulted in the foreclosure of their rental property.  *Id*,

¶ 33.  In other words, they were allegedly deprived of their business and rental property because

defendants' conduct forced them to initiate dissolution of Arlington Mart and resulted in their

creditors foreclosing on their rental property due to their unpaid debts.

Defendants argue that this allegation fails to meet the requirement of "deprivation" by

government action.  However, as explained by the Seventh Circuit in *Reed v. Village of

Shorewood*, 704 F2d 943, 947 (7th Cir 1983), even when the government does not succeed in

taking away the plaintiffs' license through revocation or nonrenewal, efforts to destroy the value

of plaintiff's licensed business is a deprivation of a property right.  In *Reed*, the plaintiffs owned

and operated a bar under a liquor license.  Plaintiffs alleged that the Village officials began

harassing their business by arresting customers on baseless claims, demanding proof of age from

customers, and initiating groundless proceedings to take away their liquor license.  Although the

state Liquor Control Commission denied several attempts by the Village to suspend plaintiffs'

license, the local officials interfered with their efforts to sell the bar, and plaintiffs eventually

closed the business and surrendered their liquor license.  The trial court dismissed plaintiffs'

§ 1983 claims alleging violation of procedural due process on the basis that defendants did not

deprive the plaintiffs of a liquor license.  The Seventh Circuit reversed, explaining:

> "[D]eprive" in the due process clause cannot just mean "destroy."  If the
> state prevents you from entering your house it deprives you of your
> property right even if the fee simple remains securely yours.  A property
> right is not bare title, but the right of exclusive use and enjoyment.  So if it
> is true as alleged that through harassment of customers and employees and
> relentless, baseless prosecutions the defendants destroyed the value of the
> plaintiffs' licensed business and forced them ultimately to give up their
> Class A license, the plaintiffs were deprived of their property right in the
> license even though the license was never actually revoked.

*Id* at 949.

Plaintiffs similarly allege that harassment by City officials and baseless prosecution of

their barbeque operation destroyed the value of their business and ultimately forced them to give

up their business.  Plaintiffs spent time and money to defend multiple citations and experienced

increased harassment from City employees and racist assailants emboldened by Chief Pryde's

refusal to respond to their requests for police protection.  Second Amended Complaint, ¶ 25.

Most importantly, Glasgow allegedly intended that plaintiffs' multiple citations result in

revocation of their business license.  *Id*, ¶ 30.  Even though defendants never revoked plaintiffs'

business license or barred their barbeque operation, their efforts to do so forced plaintiffs to give

up their business, including their license.  For this reason, plaintiffs were deprived of their

property right in the license.

Not all property interests in a government benefit, such as the right to a business license,

are protected.  For instance, "if the governing statute directs that a license shall be renewed upon

compliance with certain criteria, none of which involve the exercise of discretion by the

reviewing body, the licensee has a property right in the reissuance of the license."  *Thornton*, 425

F3d at 1164–65.  Plaintiffs do not allege the specific City regulation from which their property

right originated.  Regardless, it is premature at this point to determine whether the authority

granted to City officials to renew or revoke business licenses sufficiently limited discretion as to create an actionable property interest.  Thus, plaintiffs have successfully stated a claim for denial of due process.

### 2.  Equal Protection Claim (Claim 2)

To state a § 1983 claim for a denial of equal protection under the Fourteenth Amendment, a plaintiff must show that the defendants acted with an intent or purpose to discriminate based upon plaintiff's membership in a protected class.  *Barren*, 152 F3d at 1194, citing *Washington v. Davis*, 426 US 229 (1976).  Although Mrs. Richardson is of Laotian descent (Second Amendment Complaint, ¶ 3), Claim 2 is based on the racial classification of their employee, Causey, who is African-American.  *Id*, ¶ 51.  Plaintiffs may not bring this claim on behalf of Causey without pleading the existence of "some hindrance to the third party's ability to protect his or her own interests" (*Powers v. Ohio*, 499 US 400, 411 (1991)), which they have not alleged.

Plaintiffs argue that their claim survives as a "class of one" claim.  "When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim."  *North Pacifica LLC v. City of Pacifica*, 526 F3d 478, 486 (9th Cir 2008),  quoting *Village of Willowbrook v. Olech*, 528 US 562, 564 (2000) (*per curiam*).  "In order to claim a violation of equal protection in a class of one case, the plaintiff must establish that the City intentionally, and without rational basis, treated the plaintiff differently from others similarly situated."  *Id* (citation omitted).  "A class of one plaintiff must show that the discriminatory treatment 'was intentionally directed just at him, as opposed . . . to being an accident or a random act.'"  *Id*, quoting *Jackson v. Burke*, 256 F3d 93, 96 (2nd Cir 2001).

Plaintiffs allege that their barbeque operation was singled out among several in the vicinity, including one located on the sidewalk outside the City courthouse and two outside City Hall. Second Amended Complaint, ¶¶ 15–16, 28. As support, plaintiffs allege that City employees increased surveillance of plaintiffs' barbeque operation with in-person visits and drive-by observation in City vehicles. *Id*, ¶¶ 19–20, 28. Defendants argue that these other barbeque operations are not sufficiently similar to plaintiffs' business. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton*, 425 F3d at 1167, quoting *Joyce v. Mavromatis,* 783 F2d 56, 57 (6th Cir 1986). For this reason, the Ninth Circuit has found that different land uses, or even identical uses in a different zone, do not qualify as similarly situated. *Id* at 1167–68.

As support, defendants rely on *Burch v. Smathers*, 990 F Supp2d 1063 (D Id 2014), which dismissed the plaintiff's class of one equal protection claim, finding that the applicants who were granted special use permits were too dissimilar to plaintiff whom the City Council refused to issue a permit. *Id* at 1075. The other applicants resided in different, less-restrictive zoning districts than the one in which plaintiff had applied for a permit to operate a law office. *Id.* As contrast, the district court cited several local land use cases finding that plaintiffs' properties were similarly situated to properties on the same block (*Gerhart v. Lake Cnty., Montana*, 637 F3d 1013 (9th Cir 2011)), and but not to identical uses in different zones (*Thornton*, 425 F3d at 1167–68). *Burch*, 990 F Supp2d at 1075. "The lesson of these cases," concluded the court, "is that a class of one plaintiff must show other persons were treated differently in nearly identical circumstances." *Id* at 1075.

Contrary to defendants' contention, the Arlington Mart's alleged relationship to the other unidentified barbeque operations is more akin to the situation in *Gerhart* than in *Burch*.

Plaintiffs allege that several businesses "nearby" (*id*, ¶ 15) and in the same zoning district *(id,* ¶ 28) did not receive citations from the City.

Defendants also argue the plaintiffs failed to allege that defendants intentionally treated their business differently than others. Although the allegations acknowledge that the City treated plaintiffs differently because "those establishments either met some requirements undisclosed to [plaintiffs] or were never targeted for citations" (*id*, ¶ 15), the alleged facts support a plausible claim of intentional discrimination. Through public records requests and conversations with City planning officials, plaintiffs learned they were cited under false pretenses. The first citation, which was later dismissed, fell under a City code "applicable only [to] business[es] under review by the City [P]lanning [C]ommission" seeking "substantial change[s] in the operation and[] hours of the business," which the Arlington Mart was not pursuing. *Id*, ¶¶ 18, 21. The State Fire Marshall informed plaintiffs that the only local ordinances related to barbeques applied to apartment building balconies and not businesses. *Id*, ¶ 27. Plaintiffs later learned during adjudication of their third citation that Glasgow intended the multiple citations to bring plaintiffs before the City Planning Commission and revoke their business license. *Id*, ¶ 30. And throughout this time, the City refused plaintiffs' multiple attempts to resolve the citations through mediation. *Id*, ¶¶ 22, 26. These allegations imply not only that defendants intentionally discriminated against plaintiffs, but also that they did so with ill will.

For these reasons, plaintiffs have sufficiently alleged a "class of one" claim under the Fourteenth Amendment without alleging membership to a protected class.

### 3. **First Amendment Claim (Claim 3)**

Claim 3 alleges that defendants' "retaliatory actions violated [plaintiffs'] freedom of expression, and served to chill further free expression." Second Amended Complaint, ¶ 62.

In order to properly allege a § 1983 claim for retaliation of First Amendment activity, plaintiffs must allege their speech was chilled or deterred. As explained by the Ninth Circuit, this standard requires only a demonstration that defendants:

> *intended* to interfere with [plaintiffs'] First Amendment Rights. Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, we conclude that the proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F3d 1283, 1300 (9th Cir 1999) (citation and internal quotation marks omitted).

Defendants argue that their alleged conduct would not chill "a person of ordinary firmness" from exercising his free speech rights. However, this argument clearly involves a question of fact that cannot be resolved on a motion to dismiss. It is plausible that intimidating emails from the local Chief of Police and offensive gestures by City employees who have the influence to revoke business licenses would silence local business owners such as plaintiffs. For this reason, plaintiffs' § 1983 claim based on the violation of their First Amendment rights should not be dismissed.

## III.    Tort Claims[3]

### A.    Malicious Prosecution (Claim 4)

Claim 4 alleges malicious prosecution based on the multiple citations of plaintiffs' business and subsequent court trials using "either inapplicable law or unsubstantiated facts"

---

[3] In a footnote to their motion, defendants argue that plaintiffs' tort claims are untimely under the Oregon Tort Claims Act. ORS 30.275(2)(b) required plaintiffs to provide notice of all tort claims within 180 days of the alleged loss or injury. Plaintiffs allege that their counsel mailed a tort claim notice to Mayor Byers, Boyce, Chief Pryde, and the City on January 26, 2012. Second Amended Complaint, ¶ 29. Thus, all torts must arise from conduct that occurred during the 180 days prior to January 26, 2012, or after July 29, 2011. Defendants argue that any loss or injury which occurred before July 29, 2011, should be dismissed as untimely. The only claim that falls anywhere before the July 29, 2011 cutoff is a malicious prosecution claim arising from the first citation, but that citation was not dismissed until August 2011.

which were initiated because of "personal, malicious bias" towards them.  To prove this claim, "plaintiffs are required to establish:  (1) the institution or continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution."  *Singh v. McLaughlin*, 255 Or App 340, 352, 297 P3d 514, 522 (2013), citing *Rose v. Whitbeck*, 277 Or 791, 795, 562 P2d 188, 190 (1977).

Defendants first argue that this claim fails because the citations were not criminal charges.  However, the City's Code punishes violations of ordinances with the imposition of criminal penalties, as well as civil penalties:

> (1)    Any person violating any of the provisions or failing to comply with any of the mandatory requirements of any ordinance of the city, where a specific penalty is not specified in the ordinance for the violation, said person shall be guilty of a misdemeanor.  Any person convicted of a misdemeanor under the ordinances of the city where a specific penalty is not elsewhere established, shall be punished by a fine of not to exceed five hundred dollars ($500) or by imprisonment, not to exceed thirty (30) days, or by both such fine or imprisonment.
> (2)    Each such person is guilty of a separate offense for each and every day during any portion of which any violation of any provision of the ordinances of the city is committed, continued or permitted by any such person and he is punishable accordingly.

Gladstone Municipal Code, Section 1.08.110. [4]

Nevertheless, a malicious prosecution claim arises only when the prosecution is dismissed in the plaintiffs' favor.  As defendants correctly point out, only two of the three citations were resolved in plaintiffs' favor.  The first citations were dismissed without penalty in

---

[4] A court may take judicial notice of municipal statues because they are not subject to reasonable dispute. *Tollis, Inc. v. Cnty. of San Diego*, 505 F3d 935, 938 n1 (9th Cir 2007).  Such notice does not transform this motion into one for summary judgment because "on a motion to dismiss a court may properly look beyond the complaint to matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F2d 1279, 1282 (9th Cir 1986), *abrogated on other grounds by Astoria Fed. Savs. and Loan Ass'n v. Solimino*, 501 US 104 (1991).

August 2011 for improper service, and the third citation was dismissed on May 22, 2012, for

reasons not alleged.  A penalty was issued only for the second citation (a $500.00 fine).  Thus,

Claim 4 should be dismissed as to the second citation.

### B.  Tortious Interference with Business Relations Claim (Claim 5)

Plaintiffs allege that defendants intentionally interfered with their employment of Causey

in operating the barbeque on their property.  In order to allege sufficient facts to support a claim

for interference with business relations, the plaintiffs must allege:  (1) the existence of a

professional or business relationship, (2) intentional interference with that relationship, (3) by a

third party, (4) accomplished through improper means or for an improper purpose, (5) a causal

effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841, 844 (1995).

Defendants argue this claim fails because it does not sufficiently allege that they caused

the termination of Causey's employment.  "The fifth element requires a casual nexus between

the interference and the damage to the relationship."  *Douglas Med. Ctr. v. Mercy Med. Or.*, 203

Or App 619, 635,125 P3d 1281, 1289 (Or App 2006).  Plaintiffs allege that as a result of

defendants' interference, presumably the multiple citations and court hearings, they "lost the

advantage of operating a barbeque on [their] property, . . . and [their] ability to contract with and

employ Mr. Causey."  Second Amended Complaint, ¶ 74.

However, the only penalty from any of the three citations was a $500.00 fine and an order

to seek approval from the City Planning Commissioner for their barbeque operation.  *Id*, ¶ 23.

Although it is unclear from the Second Amended Complaint whether plaintiffs ever appeared

before the City Planning Commission to seek that approval, there is no allegation that plaintiffs

lost their barbeque privileges or business license or terminated Causey's employment because

they were forbidden to operate the barbeque.  If fact, plaintiffs do not allege the specific facts surrounding Causey's termination.  The only reasonable inference is that plaintiffs ended Causey's employment for financial reasons during the dissolution of their business in January 2013.  Even viewed in the light most favorable to plaintiff, defendants' conduct, however interfering it may have been, was not the direct cause of Causey's termination.  For this reason, Claim 5 should be dismissed.

### C.  <u>IIED Claim (Claim 6)</u>

Plaintiffs allege a claim for IIED against all defendants based on:  (1) emails from Chief Pryde threating and disparaging Mr. Richardson's character (*id*, ¶¶ 22, 76); (2) Sean Boyle making an obscene gesture while driving by the Arlington Mart on November 4, 2011 (*id*, ¶¶ 22, 79); (3) harassment with meritless citations (*id*, ¶ 79); and (4) the City's "policy or custom of intentional infliction of emotional distress on [plaintiffs]."  *Id*, ¶ 78.

Defendants argue that this claim fails to survive dismissal because the conduct alleged is not sufficiently outrageous.  "To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct."  *McGanty*, 321 Or at 543, 901 P2d at 849 (citation and internal quotation marks omitted).  "Socially intolerable conduct is conduct that is outrageous in the extreme.  Conduct that is merely rude, boorish, tyrannical, churlish and mean does not satisfy that standard, nor do insults, harsh or intimidating words, or rude behavior ordinarily result in liability even when intended to cause distress."  *Watte v. Edgar Maeyens, Jr.*, 112 Or App 234, 239, 828 P2d 479, 481 (1992).

However, this claim is premised on plaintiffs' unique relationship with defendants as business owners subject to the ordinances and rule of the City.  The existence of a special relationship between the harasser and the harassed, such as that between a government officer and citizen, "has played a role in every case in [Oregon] involving [a successful claim for IIED]."  *House v. Hicks*, 218 Or App 348, 360, 179 P3d 730, 737 (2008) (citation and internal quotation marks omitted; second alteration in original); *see Williams v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 153 Or App 686, 958 P2d 202 (1998) (government employee and disabled citizen).

In addition, "psychological and physical intimidation, racism, or sexual harassment" is typical conduct in a successful IIED claim.  *Johnston v. Pet's Rx, Inc.*, No. CIV. 06-1566-KI, 2007 WL 2746918, at *15 (D Or Sept. 19, 2007) (citing quintessential Oregon cases).  Plaintiffs allege that defendants were motivated either by a "pervasive racial bias towards their employee, Tim Causey, or because of their personal bias against [them]."  Second Amended Complaint, ¶ 51.  In other words, plaintiffs allege defendants intentionally harassed and persecuted them, at least in part, because they employed their African-American cousin.  Furthermore, they did so through psychological intimidation.  Boyle's menacing gesture while driving by the Arlington Mart, Chief Pryde's harassing emails threatening false charges, and defendants' relentless attempts to prosecute plaintiffs' business without indication of a violation were clearly intended to intimidate and could easily lead to severe psychological distress.  As a result, Mr. Richardson experienced heightened stress inducing vertigo and heart-related issues.  *Id*, ¶ 80.

For these reasons, Claim 6 should not be dismissed.

///

///

///

## RECOMMENDATIONS

Defendants' Motion to Dismiss (docket #41) should be GRANTED in part and DENIED in part, as follows:  granted as to Claims 1–3 (§ 1983) with respect to defendants Boyce and the City, Claim 4 (Malicious Prosecution) as it relates to the second citation, and Claim 5 (Interference with Business Relations); and otherwise denied.

As a result, the remaining claims are: Claims 1-3 (§ 1983) against defendants Pryde, Glasgow, and Boyle; Claim 4 (Malicious Prosecution) against all defendants as it relates to the first and third citations; and Claim 6 (IIED) against all defendants.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Monday, February 02, 2015.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  January 16, 2015.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge